Messrs. Duncan and D. Smith, *pro quer.*

Messrs. C. Smith and Hall, *pro def.*

---

Lessee of JOHN HUBLEY, CHRISTIAN WIRTZ, MICHAEL JOY, EFFINGHAM LAWRENCE, JOHN FIELD and NATHANIEL FALCONER, *against* JOHN WHITE, JOHN WATTS, PHILIP SHULTZ, and BENJAMIN CHEW.

Sales awarded for defect of special jurors.

A small book of field notes an imperfect survey begun by a deputy surveyor allowed in evidence ; but the declarations of a surveyor, made in the absence of the parties refused.

Surveys in April 1777, by one who acted under the proprietary deputy surveyor, on warrants in 1773, are inofficial, and cannot be given in evidence of appropriations of the land. So of a general draft of the lands by such person.

The board of property have jurisdiction to grant a re-survey of lands surveyed in 1793 on a special grant made in 1769, for a larger quantity than 500 acres.

Declarations of a party who has released his interest, shall not afterwards be given in evidence to invalidate his sale or title.

A patent obtained by the defendant on an ejectment, after the suit brought, shall not be given in evidence.

A determination of the board of property on a caveat, under the act of April 1692, does not extend to lands held under rights or contracts, previous to the passing of that law.

The court will not direct a nonsuit upon the merits of a case, upon complicated matter both of law of fact.

EJECTMENT for 3500 acres of land, on the waters of Green creek and Fishing creek, in Fishing creek township.

Ten of the special jurors only appeared, whereupon the court on the plaintiff's motion ordered the sheriff to return the names of six other persons, to be struck by the parties which was done accordingly. They observed, this was now the common practice ; but also remarked, that in the case of special juries, the court would see, that none but proper jurors were returned, and would hear objections on that ground.

The plaintiff claimed under eighteen different warrants, dated 16th August 1773, to Bernard Hubley and others, a survey begun by Jesse Lukens on the 7th September 1773 (when two lines were run, but nothing further done by reason of appearance of some Indians) and the surveys finally completed on the 14th, 15, 16, 17th, 18th, 19th, April 1777, by Joseph Wallis, under Charles Lukens, deputy surveyor.

A small memorandum book of field notes of Jesse Lukens, was offered in evidence by the plaintiff, and excepted to by the defendants; and a witness was adduced, who swore it did not appear to be Lukens's handwriting.

But it appearing to have been found amongst the papers of the deputy surveyor of the district, and the other witnesses believed the notes to be the Lukens's writing (though having been first traced out with a black lead pencil, and afterwards run over with a pen and ink, the usual character of his hand-writing was disguised thereby, and rendered more stiff) the court directed that it should be read in evidence. *Valeat quantum valere potest.*

The surveys made by Joseph Wallis, were also offered in evidence, and opposed in like manner. On the face thereof, they purported to be made on the 14th, 15th, 16th, 17th, 18th and 19th April 1777, and were returned in these words—" For Charles Lukens esq. Jos. Wallis, (D. S.)

Proof was given that on a hearing between the parties, before the board of property, in April 1793, Wallis had admitted, that he had surveyed the lands in 1777, but made no returns thereon, and denied that the letters (D. S.) therein were his hand-writing. Some witnesses deposed, that they did not believe those letters (D. S.) were his hand-writing; and others deposed the contrary.

A special certificate from Daniel Brodhead, surveyor general, accompanied each survey in these words:

"The above is a true copy of the original remaining in my office, which does not appear to be registered, as other returns are in the books kept for that purpose, and the survey appears to have been made at a time when the land office was closed, and no surveyor general or deputy, under the new constitution, was appointed."

The plaintiff's counsel admitted, that these surveys were not returned in the surveyor general's office till after 1781; and it was sworn that John Musser, (who, it was agreed, was interested in the lands claimed by the plaintiff,) had delivered them into the office; but the precise time and manner of doing it did not appear.

An argument ensued, whether the defendants' counsel should be allowed to give in evidence, the declarations of Wallis to one of the witnesses, respecting the signatures of the surveys, when none of the lessors of the plaintiff were present. And the case of Clymer's lessee *v.* Littler, (3 Burr. 1244, 1 Bla. Rep. 348,) was cited in support of it, and answered by the plaintiff's counsel. But the court decided, that the declarations thus made, could only be used *to* confirm or weaken his assertions at other times, when the parties were present, which were relied on.

The defendant's exception then assumed a more general shape; and it was contended, that the surveys were made without authority, and could only be considered as mere blank paper.

It was mutually agreed, that the deputy surveyors before the revolution, were not under oath, but that they gave bond and security for the faithful discharge of their duty. And likewise, that the surveys in question, were not returned into the office of the secretary of the Supreme Executive Council.

The defendants' counsel insisted, that the papers offered, differed from, and were materially distinguished from common returns of surveys. They have been put into the office by one of the parties, and to whom they were delivered is uncertain. Not being registered in the usual book kept for that purpose, they are either impositions on the part of Wallis, or an improper use has been made of his drafts.

From the principles and nature of the American revolution, it is obvious, that all propriety offices terminated when that great event took place. But on this subject, there can be no possible difficulty. A law of the state has expressly declared that all appointments by the late governor of Pennsylvania, or by acts of assembly, should cease, the trustees of the loan office only excepted.

It probably will be said, that the act "for vesting the estates of the late proprietaries of Pennsylvania in this commonwealth," asserts, that all titles and claims derived under them, their officer, or others by them duly appointed, or otherwise, shall be thereby confirmed and established. With a proviso, that the private estates of the proprietors only, which had been surveyed and returned into the land office, on or before the 4th July 1776, should be confirmed to them. And that thereby a line of distinction is drawn between the property of individuals and of the late proprietors, as to the times of surveys of their respective lands. To this it is answered, that the act only refers to the titles and claims as they stood on the 4th July 1776, and all the interest of the proprietors at that time in the soil, was thereby vested in the commonwealth. The provision, in a new clause, that the propriety estate intended to be secured by the act, were confined to those lands which had not only been surveyed, but returned before that day, strengthens this position.

This construction moreover, is fortified by the law of 17th March 1780, which was made with the express view of guarding against the mischiefs which might arise from clandestine surveys and undue appropriations of vacant or waste lands made since the 4th July 1776; and enacts, that such surveys shall not be

available in law or equity, or vest any title in such lands, unless they should be returned, with clear descriptions of the rights or claims upon which they were made, within the periods therein limited. That this has not been done in the present instance has already been agreed; and consequently the terms of this law fully apply thereto, unless it is otherwise provided for, by some subsequent act of the legislature.

The law "for establishing a land office," directs, that all persons entitled in law or equity to lands within the Indian purchase, by virtue of any grant, warrant or location, before the 10th December 1776, may receive patents, on payment of the purchase money, interest and office fees; and where surveys have not been made and returned, to the former office, an order of survey and patent may be had on certain conditions, &c. All lands theretofore surveyed and not returned, shall be returned into the surveyor general's office, in nine months. No relief is given by this law.

The act of 5th April 1782, empowers the surveyor general to receive returns of such surveys as shall appear to him to have been faithfully and regularly made, from the late deputy surveyors, for such further period as to him shall seem just and reasonable. The plaintiff, to entitle himself to the benefit of this law, must evince the regularity of his survey. The surveyor general by his certificate, has disapproved, and not approved of these returns.

The act of 4th September 1793, directs, that all returns of surveys, actually executed since the 4th July 1776, by deputy surveyors under legal appointments, shall be received in the land office, though the deputies may not be inoffice at the time of the return made; provided, they have not been more than nine years out of office.

To entitle a party to the return of surveys contemplated by this law, they must have been actually executed by deputy surveyors, whilst they acted under legal appointments. Now, John Luken's powers, as surveyor general, expired beyond all question, under the law of 28th January 1777, and his deputations must have ceased of course. It is evident therefore, that Charles Lukens could have no power to make a survey of vacant lands in April 1777, and that Joseph Wallis who acted under him, could have no greater authority than his principal.

The legislature, in their act of 9th April 1781, justify and sanction the acts of the proprietary officers in the granting of lands, up to 10th December 1776, but no further. It is therefore submitted, that these surveys were made without authority, and cannot amount to an appropriation of any lands; and consequently, that they ought not to be received in evidence.

The plaintiff's counsel urged, that at any rate the surveys were evidence, to show that the persons now suing, prosecuted their claim to lands which were begun to be surveyed in 1773, and that they never lost sight of their object. The law of November 1779, has very general and extensive words. It declares that "all and every the rights, titles, estates, claims and demands, which were granted by, or derived from the said proprietaries, their officers, or others, by them duly commissioned and appointed, or otherwise, or to which any person or persons, other than the said proprietaries, were or are entitled either in law or equity, or by virtue of any deed, patent, warrant or survey, of, in or to any part or portion of the lands, comprised and contained within the limits of this state, or by virtue of any location filed in the land office, at any time or times before the said 4th July 1776, shall be and they are hereby confirmed, ratified, and established forever, &c.

Now, though the locations must be entered before that day, there are no words which limit the surveys to that period. The terms are "by virtue of any deed, patent, warrant or survey." The words "or otherwise" have some meaning, and can refer to nothing, but to some supposed or implied defect of power, in the late proprietary officers. The distinction made between the lands claimed by individuals, and by the late proprietaries, in their private capacities, must strike every reasonable mind. To vest an interest in the latter, surveys must have been made and returned before a certain day; but in the former case the legislature are wholly silent, and it may fairly be concluded, that any survey made for a private person previous to the passing of that act, by an officer *de facto*, would be good and valid. The law favours the acts of persons in reputed authority. To reconcile the minds of the people to the measure of taking from the late proprietaries their interest and property in the soil it became necessary to use strong expressions in the law, thereby securing all the rights and claims of individual citizens. A mortgage made on the 20th June 1776, acknowledged the 5th July, and recorded on the 3d November 1776, was held good and valid; and one of the reasons given by the court was, that all transactions in the land office and other offices, during the interregnum, which were in themselves fair and honest, have uniformly been considered as valid, for the sake of public convenience. Dall. 436, 438. The reason why surveys were directed to be returned to the secretary of the executive council, was merely on account of the land office being shut.

The act of 9th April 1781, cures the defect in the plaintiff's title, in not returning these surveys to the secretary's office. If the surveys were returned in nine months from the passing of that law, it is sufficient. It, was not necessary that the surveyors should return the surveys with their own hands. The party interested may well do it for him, and this is known to be a customary thing. If the surveys were lodged in the office before the 9th January 1782, there was no occasion for the surveyor general to exercise any discretion in the business. His certificate at this time can neither diminish nor add weight to the surveys. They were found duly returned into his office, and derive authenticity from that circumstance. The intention of the legislature in passing the law of 4th September 1793, was to ease the citizens of the expenses of new surveys. Charles Lukens did act under a legal appointment; Joseph Wallis did business under him; and it would be attended with the most pernicious consequences to lay down the doctrine, that all the acts of deputy surveyors from the 10th December 1776, to 27th November 1779, were merely void and of none effect. The court declared their opinion, that the surveys offered in evidence, did not appear to be executed by a proper officer, whilst he acted under a legal appointment. A mode had been provided by the act of assembly of 17th March 1780, by which they might have been rendered legitimate, but the directions of that law not having been pursued by a return into the office of the secretary of the Supreme Executive Council, no succeeding law that they knew of, cured the defect of proper authority in Joseph Wallis who made the surveys; consequently, the surveys could not be received as evidence of the appropriation of vacant lands, but only as merely pursuing and continuing the claim of the parties. The court however, invited the plaintiff's counsel to require that the point might be reserved for further investigation, which was done accordingly.

The plaintiff then gave evidence of having paid Joseph Wallis 127*l*. 2*s*. 6*d*. by his receipt bearing date the 9th April 1778, for surveying sundry tracts of land, and making a draft extraordinary; and a general draft made by Wallis, connecting twenty-five surveys together, was offered in evidence and excepted to.

*Per curiam.* If this paper is offered as evidence of an official survey, we must reject it, to preserve consistency in our opinion; but if it is offered as written declaration of Wallis, to

strengthen or weaken his assertions before the Board of Property, in the presence of the parties, it may be admitted for those purposes, but no further. It cannot be made use of to establish any independant fact. This point however, may also be considered as reserved for future discussion.

The plaintiff having closed his evidence, the defendants produced a special order of the governor, dated 10th August 1769, No. 3731, for 5000 acres of land, to be laid out and surveyed for Benjamin Chew, esq. upon the head branches or lakes of Fishing creek, which runs into the north-east branch of Susquehannah, in one or more tracts, any where above the first forks, or upon the lake or lakes at the heads of the branches; and a survey thereon by Charles Stewart and Jesse Lukens, deputy surveyors, of 2254 acres and allowance, on 27th and 28th October 1773, and another survey by the same deputies in the same month of 1753 acres, on Little Fishing creek and Green creek, which included the lands in question, and which also interfered with surveys made for other persons under prior rights, to the extent of 1001 acres and 32 perches, or thereabouts. It was also shown in evidence, that on the 8th July 1773, Benjamin Chew filed a *caveat* in the office of the surveyor general, against the acceptance of any survey on the head branches or lakes of Fishing creek above the first forks, by virtue of any location since the 10th August 1769.

It was further stated, that on the memorial of Chew to the board of property on the 30th September 1791, they ordered the surveyor general to re-survey the first tract of 2254 acres, and denote the claims of persons thereto. Whereupon, William Montgomery, deputy surveyor of the district, made a re-survey thereof, leaving 401 acres and 97 perches free from dispute, exclusive of some small scraps of land of little value, amounting to about 400 acres, but of no value whatever unless accompanied with the possession of the lands adjacent, on the 15th November following.

This testimony was excepted to by the plaintiff's counsel, who urged, that the Board of Property had no jurisdiction in the premises. By the act of 9th April 1781, (Bailey's Edit. 469. Loose Laws 423,) this board was first instituted after the revolution, and consisted of the secretary of the land office, the receiver general and and surveyor general. In the last section of this act it is declared, that nothing therein shall be construed to give validity to any warrant, grant or location, for a greater quantity of land than 500 acres in one tract. A location was afterwards defined by the act of

25th June 1781, (Bayley's Edit. 581. Loose Laws, 474) to be "an application made for land in the office of the late secretary of the land office, entered in his books, numbered and sent to the surveyor general's office. By the former act therefore, the locations of this description were only validated, where they did not exceed 500 acres, and the jurisdiction of the Board of Property could not possibly reach to application or grants of greater extent.

For the defendants, it was, insisted, that the validity of locations whereon surveys had been duly made, did not rest on the act of 9th April 1781, but on the great principles of substantial justices, and the act of the 27th of November 1779 (Bayley's edit. 260. Loose Laws, 277) so much commented already upon, in the course of this cause. By the defendant's construction thereof, which has met the approbation of the court, the rights of individuals to lands, as they stood on the 4th July 1776, are thereby firmly secured to them. By the law of the 5th April 1782, (2 Dall. St. Laws 21, 22) another Board of Property was constituted, to consist of the president, or vice president, a member of the Executive Council, the secretary of the land office, the receiver general, and surveyor general, "to hear and determine in all cases of controversy on *caveats*, in all matters of difficulty or irregularity, touching escheats, warrants on escheats, warrants to agree, rights of pre-emption, promises, imperfect titles or otherwise." The formation of this board was again changed by the law of 8th January 1791, (3 Dall. St. Laws. 2) and the members thereof declared to be the secretary of the land office, the receiver general, surveyor general, and master of the rolls for the time being, or any three of them: but their powers were continued, as under the act of 5th April 1782. The terms of that law are sufficiently comprehensive to reach the present case, and show clearly the Board's jurisdiction.

The court declared, that if there had not been such large and extensive words in the act of 5th April 1782, " in all matters of difficulty or irregularity, touching warrants to agree, rights of pre-emption, promises, imperfect titles or otherwise, which unquestionably include the grant to Mr. Chew, the Board of Property must of necessity, in order to prevent confusion and litigation, have possessed the powers contended for. The last section of the act of 9th April 1781, most probably arose from the jealousy had of the proprietary special grants to particular persons; but it can only refer to warrants, grants or locations

unexecuted, where the parties have been guilty of laches and negligence, in obtaining appropriations of vacant lands by actual surveys. Any other construction would effect manifest injustice. Let the papers be read.

The declarations of Samuel Harris were then offered in evidence by the defendants, respecting the last survey of 3753 acres for them. This was opposed, on the ground of none of the lessors of the plaintiff being present.

It appeared probably that Harris discovered the land, and furnished the description thereof to the lessors of the plaintiff. Previous to taking out the warrants, he had in 1773, together with John Hubley and Co. subscribed a paper, whereby they agreed, that the warrants when issued, should be subject to a speciol order issued in favor of Robert Morris and Tench Francis, dated 14th May 1773, for 4000 acres on Fishing creed, which by the terms thereof was to be postponed, until Chew's order for 5000 acres was fully completed. On the general draft of the lands made by Wallis was, also endorsed by him, "Samuel Harris and Co. for 7,750 acres" But it also appeared, by the deposition of one Weitzel read in the cause, that Harris had relinquished his interest in the lands, before the imperfect survey of Jesse Lukens was begun on the 17th September 1773.

By the court. If the plaintiff had made out his title through him, testimony would have been given in what relation he stood to the lessors of the plaintiff. As matters now stand, his interest comes before the court on an incidental question. Mr. Hubley signs the instrument for himself and company. Harris subscribes his name below him, which would not have been required of him, unless he had been concerned in some shape on the lands. Most probably he was interested only as a mere discoverer of vacant lands, and received compensation for his information. But the company considering him as interested at and immediately before the taking out of the warrants, his declarations at that time must clearly be received in evidence against them. When however he has surrendered up all his pretension, as it is sworn he has done before the 7th September 1773, his subsequent declarations cannot be made use of to invalidate his own sale, or affect the plaintiff's title. Wallis's indorsement on the general draft, has little weight, unless additionally fortified. The testimony offered must therefore be overruled.

The defendants further give in evidence, a *caveat* filed by John

Hubley and Co. dated 20th February 1692, against Benjamin Chew's obtaining a patent for the lands in question, alleging that they had prior warrants and surveys of the same lands. Also, a further memorial of Benjamin Chew to the Board of Property on the 18th June 1792, whereon they directed a re-survey of the lands on Little Fish-creek and Green creek; and a re-survey thereof by William Montgomery on the 1st September following, making the whole amount of the lands comprized within the limits thereof to be 3901 acres and 112 perches, but the interferences thereof with surveys made under prior rights reduced the same to 2900½ acres and the usual allowance. These interferences and the prior rights were shown by authenticated office-papers, to the jury.

On the 11th April 1793, the Board of Property, on a full hearing of the contending parties, made their decision, wherein they rejected the surveys made for John Hubley and Co. so far as they interfered with the survey made for Benjamin Chew, but stayed the issuing of the patent to the latter, for the term of six months.

It appeared, that the present ejectment was brought in the Court of Common Pleas, to April term 1794, and that the demise in the declaration was laid on the 2d November 1793. It was admitted, that Mr. Ingersoll appeared specially for Mr. Chew, when the ejectment was served on him in Philadelphia, and that he claimed the benefit of the act of assembly passed on the 3d April 1792. 3 Dall. St. Laws, 213.

The defendants then offered a patent dated 22d March 1796, to Benjamin Chew, in evidence; and insisted, that the same was a full and perfect title to the lands against the plaintiffs in the present suit, being grounded on the decision of the Board of Property, and no action having been entered at common law by the lessors of the plaintiff, within six months after the determination.

The court expressed their doubts, how far a title vested in the defendants through third persons, after an ejectment brought, could be given in evidence on that suit, independent of a positive law; and desired that point might first be agreed, abstracted from the act of assembly in question.

It was admitted by the defendants' counsel, that the plaintiff in ejectment must recover according to his title, at the time of his demise laid. T. Ray. 463. Law of Eject. 13. 4 Term

Rep. 680. Bull. 4to edit. 103. But it is otherwise with a defendant. Ejectments are fictitious remedies in law, (3 Burr. 1294,) and under the control of the court, so as to be modelled to answer every end of justice. Suppose then, that after bringing an ejectment to recover lands, the lessor of the plaintiff should release to the defendant. Shall not this be laid before the jury? Or if a descent should be cast on the defendant of the title to the property, pending the suit, shall the evidence thereof be unheard at the trial? Or suppose tenant* for life is the lessor of the plaintiff and he dies before the trial, shall the defendant be stripped of the possession, when it must immediately go over to another?

In actions on the case, it is said to be a general rule, that matters of defence, arising after the action brought, and before the cause comes on to be tried, showing that the plaintiff has no just cause to recover, may be given in evidence. 3 Burr. 1354. Doug. 102, 105. The same principle applies to ejectments.

But we are not confined to mere cases of analogy. In an ejectment brought by a landlord against his tenant, an acceptance of rent from the tenant afterwards, should go to the jury. Cowp. 243, 245. In such a suit for non-payment of rent, the tenant may at any time before trial, pay into court the rent arrear and costs, and the proceedings shall be stayed. Bull. 97. It is competent to a tenant who is defendant in ejectment, to show that the title of the lessor of the plaintiff, who was his landlord, had expired. 4 Term. Rep. 672.

*Pro curiam.* In the cases first put, it seems highly probable, that the court would exercise on the return of the *postea*, their superintending power and control over this fictitious form of proceeding, to prevent injustice and circuity of action. But the question is, whether a patent obtained after an ejectment brought, shall be given in evidence by the defendant, to defeat the plaintiff's action?

In all the cases cited, except the last, matters which have passed between the plaintiff and defendant since the commencement of the suit, have influenced the determination thereof; and in ejectments † by landlords against tenants in England, for non-

---

* The case is put 2 Stra. 1056, and it was there resolved, that the court would not stay the proceedings, for the plaintiff might go on for damages and costs. But it was admitted, that possession could not be obtained by the suit.

† Courts of law and equity, previous to the stat. of 4 Geo. 2, c. 28, have exercised a discretionary power of staying the lessors from proceeding at law, in cases of forfeiture for non-payment of rent, by compelling them to take the money really due to them. Andr. 341. 2 Salk. 597. 8 Mod. 345. 10 Mod. 383. 2 Vern. 103. 1 Wils. 75 2 Stra. 900. Espin. 430.

payment of rent, courts of justice have been very liberal. The point in dispute, of a title derived by the defendant through a third person, has frequently come before the court at Nisi Prius, and such evidence has constantly been overruled. But we give no opinion, how far the words and intention of the legislature in the law relied on, may effect an exception in the general practice.

*Smith*, J., said, he perfectly recollected a case on the western circuit, wherein he was counsel, and urged evidence of the same nature in behalf of a defendant, and the same was refused by the Chief Justice.

The court added, that in most cases it was of no moment to the defendant, whether the title was shown to be in himself or in a stranger. If the title was not proved to be in the lessors of the plaintiff, they could not in general recover. And where any thing had happened since the commencement of the suit, which rendered it inequitable that the lessors of the plaintiff should receive the possession, the more eligible mode would be to apply to the summary powers of the court for relief.

The plaintiff's counsel insisted, that the act of assembly of the 3d April 1792, was unconstitutional, as to the provisions thereof in the 11th section. It abridged the judicial power of the courts, violated the right of trial by jury, and in the extent contended for by the defendants, impeached former contracts. By the bill of rights, it is declared § 6, trial by jury shall be as heretofore, and the right thereof remain inviolate; and in § 17, no *ex post facto* law, nor any law impairing contracts, shall be made. No legislative provision is made, either under the act of 9th April 1781, (Bailey's edit. 469. Loose Laws 423,) or of the act of 5th April 1782, 2 Dall. St. Laws, 21, or of the act of 8th January 1791, 3 Dall. St. Laws, 2, (by which the Board of Property has been differently modified,) or any other *lex scripta* that we know of, by which a fair hearing is secured to the citizens of the commonwealth, before this new judicial authority. It rests on the first section of the law of 8th January 1791, that the " secretary of the land office is empowered to appoint days of hearing, and grant citations, at the reasonable request of any person or persons applying for the same or otherwise, as the case may require," or in the more general expressions of the act under consideration, " in manner heretofore used in this commonwealth." 3 Dall. St. Laws, 213. It does not require a fervid imagination to conceive a variety of cases, wherein the most extreme injustice might be sanctified under this section, if

in its extent of operation, the patent under the determination of the board, " is to be and remain full and perfect title to the lands against all parties and privies to the *caveat* or suit."

It is however possible that a more rational construction may be had of this section. It may be confined to lands vacant and unappropriated at the time of passing the act ; and it may be said, with some kind of plausibility, that the commonwealth, as an individual, may sell their property on such terms as they may think proper. But this doctrine cannot hold, as to subjoining new terms to lands before contracted for.

The title of the act is " for the sale of the vacant lands within this commonwealth ;" the *preamble* thereof alludes to unappropriated lands ; and the great body of the law speaks the same language.

A statute does not extend to cases within the general words, though not within the meaning thereof. 4 Term Rep. 2, 4.—Where it introduces a new jurisdiction, it shall be construed strictly. 1 Stra. 258. 260. 10 Co. 75. So where it takes away a remedy given by common law. 4 Bac. Abr. 650. Oftentimes cases within the letter of a statute are not within the sense thereof, the sense being sometimes more confined and contracted than the letter, and sometimes more large and contracted. Powel on Dev. 140. The judges are to look at the words which the legislature have used, and to construe them according to the meaning, which it is most likely they entertained at the time the subject was under consideration. Leach's Cro. Law. 387.

If upon the whole the court should be of opinion that the section under consideration is unconstitutional, they are bound by their office to say so, without respect to consequences ; but if they should think that the generality of the expressions was intended to embrace no other objects than lands merely vacant, they will narrow them to these only ; in either case it is hoped they will reject the patent in evidence.

The defendants in reply : A court of justice will be very clearly satisfied before they pronounce a law to be unconstitutional. The necessary consequence must otherwise be, that the judicial power must surmount the legislative. Where the legislative authority enacts a law, the office of a judge does not justify his inquiries into the prudence or danger, the wisdom or inefficacy of the measure, or whether in some possible cases, the execution of it may not produce ill effects to some individuals. Courts are equally bound by the will of the community thus promulgated, as any class of citizens. It is true, where the intention of the legislature is clear, they may deviate from the

literal expressions, to effectuate that intention ; but where the words are large and comprehensive, they will not on the ground of inconvenience narrow their construction.

The question then is, had the legislature a constitutional authority to enact this section ? They do not thereby abridge the judicial power or the right of trial by jury ; the party against whom the determination goes, may enter his suit at common law within six months afterwards. It affects no prior vested right, nor impairs the obligation of of any contract. It merely operates as a limitation act, and in policy must be traced to the prevention of law suits. The rights of persons under legal disabilities are fully saved. It will not be asserted that the limitation acts heretofore passed are unjust, because they may in some instance operate against an honest claimant.

The act for the better support of the public credit, &c. passed 10th April 1781, § 9, (Bailey's edit. 479. Loose Laws 430) limits a time within which claims against the commonwealth are to be prosecuted for lands within the state ; and in default thereof the parties are utterly barred and excluded from all right of entry and title, in or upon such lands, or any suit whatsoever in law or equity for the same. This law likewise may bear hard against particular persons, but it is certainly defensible on the extended scale of public policy and general convenience. The like observations may be made on all bankrupt and insolvent acts, on the act respecting frauds and perjuries, on the act prescribing the mode whereby *femes covert* may convey their estates and many others. Individual, particular interests must in every well constituted society, give way to prudent regulations, calculated for the general welfare. On the act of 28th May 1715, " for the assigning of bonds, specialties and promissory notes, " it has been often ruled, that set-off may be made against the indorsees of promissory notes, of monies paid to their indorsers under the words of that law. These resolutions have operated severely against commerce, but have hitherto been acquiesced in from the necessity of submitting to the plain intention of an act of the legislature.

By the court. We cheerfully disclaim all legislative power ; but it will not be denied that we possess the right of putting such construction on the acts of the legislature, as appears to us best to accord with their intention, either express or implied. Hob. 346. 11 Mod. 161. 4 Term Rep. 3, 4. Dall. 434. We cannot construe a law differently from the plain clear words of it, under any ideas of convenience or equity. 1 Term Rep. 101. Vaugh. 37, 169, 285. 2 Ld. Raym. 1423. Arguments

*ab inconvenienti* only apply where the law is dubious.   We possess also
the power of declaring a law to be unconstitutional, and such power has
heretofore been exercised.   But we agree fully with the defendant's
counsel, that a very clear case only can warrant it.   11 Co. 63.   10
Mod. 115.  Vid. 1 Bl. Com. 91. 3 Dall. 395.  When  such cases arise
we shall not shrink from the decision.   It is sufficient for us, on the
present question to declare our opinion, that the 11th section of the
act of 3d April 1792 does not extend to the case now before us.   We
do not much regard the title of the law ; it is said to be no part of a
statute.  Hardr. 324.  1 Ld. Ray. 77. 3 Co. 33. 8 Mod. 144.  1 Bl.
Rep. 95.   But the preamble has considerable weight in discovering its
meaning.  Co. Lit. 79. *a.* Plowed. 369. 2 Co. 16. 9 Co. 105. Hob.
182.   Though it will not control the clear and positive words of the
enacting part, it may explain them if ambiguous.  4 Term Rep. 793.
The declared object of the whole act goes to the unsold and unsettled
lands within the Indian purchase at Fort Stanwix in 1768 and the pre-
ceding purchases, and to the vacant lands, included in the Indian pur-
chase of 1784 at Fort Mackintosh.   All the provisions in the law go
merely as to unappropriated lands, except that in the last section, it
is directed that unsatisfied warrants issued under a former law, may
be located on vacant and unappropriated lands.   To comply therefore
with the whole scope of the act, and declared intention of the legis-
lature, the generality of the expressions in the beginning of the 11th
section, " when any *caveat* is determined," &c., must necessarily be
restrained to any *caveat* relating to lands then vacant and unappro-
priated. The clause in question cannot be extended, in our apprehen-
sion, to *caveats* respecting other lands, held under rights or contracts
antecedent to the passing of this law.

The words of the section now under consideration, are not more
large and comprehensive than those used by the legislature in the 5th
section of the act of 8th April 1785, (2 Dall. St. Laws 318.  Loose
Laws 569) " that in making any survey " by any deputy surveyor,
he shall not go out of his  proper district," &c.   Nevertheless, in the
case of the lessee of Alexander Wright v. Benjamin Wells, at Wash-
ington, May assizes 1793, M'Kean, Chief Justice and Yeates, after
full argument, ruled, that the expressions related  solely to the lands
purchased at Fort Mackintosh.

We give no opinion whatever of the constitutionality of the 11th
section, nor to what cases it does extend ; but we conceive it does not
embrace the case before the court, and therefore the patent cannot be
received in evidence.

The defendant's counsel thereupon desired the court to seal a bill of exceptions, which was agreed to.

The testimony being at length closed on both sides, the defendant's counsel moved for a nonsuit ; but the court declared, that on complicated matters both of law and fact, the court would not direct a nonsuit on the merits of a case, where material evidence had been given by the party against whom the nonsuit was prayed. They added, that the court would not order a nonsuit to be entered against the plaintiff's consent. 2 Term Rep. 281. 1 Term Rep. 176. 1 Bl. Rep. 670. Vid. Dall. 18. To save time however, the court had no objection to declaring their opinion on the title. The plaintiff could not legally recover, as he had no official survey. Moreover the title of the defendants was prior in point of time, and Messrs. Hubbley and company had agreed that their warrants should be postponed until Mr. Chew's order on Fishing creek was fully completed. It was fully proved, that the survey for the latter, including the lands in question, was made in the latter end ef October 1773, and the notoriety of that fact was clearly evinced by several office papers. The default of the deputy surveyors in not making the return into the surveyor general's office, was not to be imputed to Mr. Chew, nor was his title affected thereby.

Only one of the counsel on the part of the plaintiff addressed the jury, who found a verdict for the defendants, agreeably to the charge of the court.

Messrs. Duncan C. and D. Smith and Hall, *pro quer*.

Messrs. Ingersoll, E. and W. Tilghman and Thomas, *pro def*.