In order to open a way, so as to get a complete view of the main question, it may be necessary to consider, first, whether judgments bind real property or not; and if they do in ordinary cases, secondly, to what extent; thirdly, whether they will bind lands within the Indian boundary.
1st. The cases in Haywood, 94, 95, show that judgments bind real property against the alienations of the owner, but not as against executions.[1] The authority of this case establishes the law, WILLIAMS, J., in Hayw. 99, 100, seems to have taken up a wrong idea of this decision; though he did not decide contrary to the principle, he states it to have been decided that executions' only, and not judgments, would bind land in this country. These impressions however do not in the smallest degree shake the authority in page 94. Conformably to this opinion was the decision in the case Irvin's Lessee v. Overton, determined a few years ago in the district of Mero.
2d. In the investigation of this part of the case it seems important to inquire into the common law, and the reason of that law, and see how the reasons apply here. The judgments in England, which bind real property, are those rendered in the Court of King's Bench, Common Pleas, and Exchequer. Statutes staple and merchant, acknowledged before *Page 162 
proper officers, and enrolled in chancery; these are courts of general jurisdiction and not limited. All subjects are presumed by law to know what judgments are rendered there. The original jurisdiction of these courts is coextensive with the kingdom. In the transactions of individuals, one with another, they were bound to take notice of all judgments rendered in these courts, so far as they might be affected by them. There was great propriety in this, because it secured the creditor, and it was no hardship to oblige persons who might wish to purchase to look to the records of these courts; they were few in number, situated in one place, and, being of general concern, society were presumed to be informed from the general attendance of individuals at them.
The organization of our judicial system is different; the general original jurisdiction, even of our superior courts, is limited to districts consisting of several counties. The authority of county courts is, in like manner, limited to their respective counties. It is true that our statutes furnish some exceptions, and authorize each of these courts to send their process without the limits of their respective jurisdictions. The running of an execution from one district or county to another was necessary to prevent an evasion of the law. The original process, with the proceedings and judgment, might become nugatory and lifeless without such a provision. Other provisions of a similar nature are mere exceptions to the general rule furnished by the legislature for the better attainment of justice.
The general rule that our courts are of limited original jurisdiction is a distinguishable trait in our judicial polity, In the common course of things, the people of a county attend their respective county courts; so of a people of a district. But do people usually attend other county or district courts than their own? They do not. Grand and petit jurors are assembled from different parts of a district or county; besides, a similar attendance of suitors and witnesses. This, by the structure of our government, opens a copious source of information of what passes in our courts.
The common law never could be so unreasonable *Page 163 
as to require individuals at their peril to take notice of the decisions of courts where individuals in society were presumed not to attend. The binding force of judgments in England rests upon constructive notice principally which originates from the usual attendance of people at their courts.[1]
This principle, however, is not to be so favored as to be carried beyond the reason of the law. When the reason upon which the law is founded ceases, the law ceases with it, So far from extending the principle of constructive notice of judgments to purchasers, the English government in latter times have thought proper to narrow it. Stat. 29, C. 2, c. 3, § 15. Our statutes are silent as to the binding force of judgments; not so as to mortgages: a security most analogous to the one under consideration. Mortgages first registered in the county where the land lies will hold, unless a prior mortgage shall be registered within fifty days after date; 1715, c. 38, § 11. This evinces the sedulous care of the legislature to guard purchasers; the notice in this case is derived from the register's books of the county where the land lies. Why ought a judgment of a district or county court to have a more extensive operation as to notice? No solid Reason is believed to exist. To oblige a man to examine the clerks' offices of every court in the State before he can purchase land in safety is a greater burden than the law of England ever contemplated, or is consistent with the ordinary occupations of mankind. It seems, therefore, just to conclude, that a judgment does not bind without the limits of the original jurisdiction of the court in which it was rendered, and then not after it has become dormant.[2]
This opinion is believed not to contravene the decision in Haywood, 94. In that case the laud appears to have been in the same county where the judgment was obtained.
The lien of a fi. fa. is a different consideration. The last and most important part of the examination is whether judgments shall bind lands with in the limits of the country reserved to the use of the Indians, supposing them to be situated in a district or county. *Page 164 
The confident manner in which the plaintiff's counsel have treated this part of the case, as well as to satisfy doubts which may exist, renders it proper to examine this subject from its source.
Great Britain colonized the country now occupied by the different States; she made charters or deeds to individuals of extensive tracts of country, among which we find in Ird. page first, the second charter of Charles the Second to the proprietors of Carolina, made in the 17th year of his reign. The limits expressed in the charter extend westward as far as the South Seas. The claim or right of the aborigines or Indians is not mentioned. In the Constitution of North Carolina, Declaration of Rights, section 25th, are these words: "The property of the soil in a free government being one of the essential rights of the collective body of the people, it is necessary, in order to avoid future disputes that the limits of the State should be ascertained with precision," it then describes several lines until the western boundary is defined, which is agreeable to the charter of King Charles the Second. That part of the State lying west of the Mississippi was relinquished by the definitive treaty of peace between the United States and Great Britain.[1] There is a provision in this section of the Declaration of Rights that it "shall not prejudice any nation or nations of Indians from enjoying such hunting grounds as may have been or hereafter shall be secured to them by any former or future legislature of this State." It was further provided that it should "not be construed so as to prevent the establishment of one or more governments westward by consent of the legislature." All rights of sovereignty within these limits the Constitution of North Carolina, ratified in December, 1776, expressly declares to be in that State. In the year 1789, North Carolina adopted the Constitution of the United States, which abrogated such parts of her Constitution and laws as were inconsistent with it. The 8th and 10th sections of the first article of the Constitution of the United States give to the General Government the exclusive right of regulating the intercourse of the citizens of the several States with the Indians, and of making treaties with them. *Page 165 
After passing through two stages of provincial jurisprudence, agreeably to the ordinance of Congress of the 13th of July, 1787, the western part of the State of North Carolina was erected into a State by the name of Tennessee, on an equal footing with the original States in all respects whatever; and with the consent of North Carolina, as expressed in her Cession Act.[2] The Constitution of the State of Tennessee, under the authority of which she was admitted into the Union, Declaration of Rights, § 32, after defining the limits of the State, declares that the people of this State have the right of exercising sovereignty over the described tract of country, consistent with the relation they bear to the government of the United States.
The rights of the aborigines as a sovereign people are not recognized, neither in the charter of King Charles the Second nor the Constitution of North Carolina. The first does not mention them at all, and the second in very different language from that which is usual when mentioning a people sovereign in fact. The rights of these people are best understood by recurring to the acts of North Carolina, when possessing jurisdiction over the country, now the State of Tennessee, the Constitution of the United States, and the laws made in pursuance of it. As between citizens of the same government this is the only guide. The Constitution of North Carolina does not acknowledge any right of eminent domain, but says that any right of enjoying their hunting ground which has or may be secured to them by Act of Assembly shall not be impaired by the Constitution. The language of their Act in 1783, c. 2, is nearly the same. This act at pleasure, without consulting the Cherokee Indians, reserved such part of the lands to the Indians as the legislature thought proper: the balance extending as far as the Mississippi, they by that act authorized to be sold for the use of the State. It was sold, and entries made upon such sales in what was called John Armstrong's office, for which the State of North Carolina issued grants. The treaty of Hopewell, under the authority of the confederation, made in November, 1785, uses the language of "allotting to *Page 166 
the Cherokees lands for their hunting grounds." These, with all the treaties, make the Indians acknowledge the protection of the United States. Very different indeed from the rights of complete sovereignty. The treaty of Holston, in the year 1791, abridged the limits of the citizens and extended those of the Indians; consequently a great quantity of land sold by North Carolina to her citizens was thrown by this treaty within the Indian boundary. It was however severe, yet obligatory, having been made by the United States under the authority of the Federal Constitution, to which all the States agreed.
The natives are as much entitled to the rights of humanity as we are And to the honor of the American government, be it spoken, that it has been more scrupulous in observing and enforcing the duties of humanity than British monarchs under the colonial governments. We seldom find their name mentioned in their charters or solemn acts of their government. Humanity and its rights were not forgotten in our Constitution and laws. But how far has the Constitution and laws of the United States, made in pursuance of it, abridged the sovereign rights of each State? The answer is easy. No further than the States have expressly, and not by equitable construction, delegated authority to the United States.[1] The Constitution of the United States was proposed to each State possessing the rights of sovereignty within their respective limits. It proposed that each State should give up a portion of its sovereignty for the more secure and convenient enjoyment of the remainder.
This construction is conformable to the law of nature applied to nations. By this law, nations as well as individuals are tenacious of the rights of self-preservation, of which, as applied to sovereign States, the right of soil or eminent domain is one. Constitutions, treaties, or laws, in derogation of these rights are to be construed strictly. Vattel is of this opinion, and, what is more satisfactory, the Federalist, and the American author of the Notes to Blackstone's Commentaries, two of the most eminent writers on jurisprudence, are of the same opinion.[1] The Constitution of the United States gave the *Page 167 
power to the General Government to regulate intercourse with the Indians and to make treaties. The States, having conceded these powers, no longer possess them. The Constitution was a dead letter until the treaties and the laws of the United States pointed out the principles of this intercourse. By treaty certain lands within the limits of the State are in its language "allotted, granted, and secured to the Indians, within which the citizens are not to hunt, drive stock, survey, nor even go there without permission. If they do, or commit other trespasses, they are subject to heavy penalties.[2]
But does the Constitution of the United States or its laws take from the sovereign rights of the State further than is incompatible with these regulations? They do not.[3]
Hence it is deductible that a judgment will bind land within the Indian limits as well as without, provided the district or county in which the judgment was rendered extended there. Laws should receive a liberal construction for the benefit of creditors if the right of the debtor to land within the Indian boundary was not destroyed by a subsequent treaty. The nature of our government is, that no law shall be made to impair the obligation of contracts. North Carolina did contract, sell, and grant lands within the boundary as now established, before any treaty was made. She had a right to do so. At least citizens of, and claiming lands under, the same government are estopped to say otherwise. The principles of the federal compact forbid a different construction, and the language of the laws of the United States expressly recognizes this right; 2 L. U. S. 305. No language that an act of Congress could adopt could deprive a State of its original right to the soil within its limits; subject, however, to such partial restrictions as to its use or enjoyment as Congress may think proper to interpose in regulating the intercourse with the Indians. These ideas, however, are offered upon abstract principles. As to the particular situation of this State, emerging as it did from a territorial government, no opinion is given. The ordinary rights of *Page 168 
sovereignty may exist in a State without the right of soil.
The last inquiry to be made is whether this land is situated within the district of Hamilton where the judgment was obtained. Districts by our Constitution and laws are composed of entire counties, the land therefore must be within some county, otherwise not within a district. Knox was the only county in which it could be. In the western part of the State of North Carolina the county of Washington was first laid off. 1777, c. 31, Ird. 346. In extended westwardly to the Mississippi, and north and south across the limits of the State; Sullivan and Greene counties were next erected. Ird. 395, c. 29; 473, c. 51. Then Hawkins, the western boundary of which is described by a line beginning at the Suck, where Tennessee runs through Cumberland Mountain, thence along the top of the mountain to the Virginia line, now the Kentucky line. 1786, 34; Ird. 599. At this time the county of Greene, beside a part of the country east of Cumberland Mountain, included all that lay west of it, except such as fell within the counties west of the mountain. In this state of things the counties of Greene and Hawkins were circumscribed in their limits to the Indian boundary, as established by the treaty of Holston, and the county of Knox erected. Ordinances of the governor and judges passed on the 11th of June, 1792. Roulstone's ed. of the Tennessee Laws, IV. The line which Col. McClellan speaks of, was not at that time run. The boundary of Knox county calls for it. Whether the line as actually run by the commissioners in the year 1797, or as it is contended it should have been run, be the true line of the county, I will not now undertake to say, being interested in a question of a similar nature.[1] The jury are competent to decide the law and the fact; and they will judge of this part of the case as they may think right. Should they think that the western boundary of Knox county did not take in the defendants they will find for the plaintiff, otherwise for the defendants, upon this ground. If the validity of the ordinance of the governor and judges rested upon their authority alone, it might be *Page 169 
justly questioned; but the legislature seems to have confirmed their acts. 1794, c. 7. The practice of North Carolina was to make the counties in their limits coextensive with the State. This principle was first altered by the ordinance alluded to. The reasons are unknown. The change was pursued in relation to all the frontier counties, but was done away and the original principle restored by an Act of 1801, c. 37.
Verdict for defendant — Motion for a new trial — continued.
NOTE. — The legislation and decisions of the courts upon the English statutes which, are to be considered in force in this State, may be condensed thus: —
The British statutes in force are generally: —
"Statutes passed previously to the fourth year of James I., 1607, when the charter of the colony of Virginia was granted, which colony then included what was afterwards called North Carolina." Supra,
153; Green v. Allen, 5 Hum. 233, citing the principal case.
"Statutes passed afterwards up to the Revolution, where the colonies were specially named." Shute v. Harder, 1 Y. 1.
"All statute laws made for the limitation of actions, and preventing of vexatious lawsuits, and for preventing immorality and fraud; and for confirming inheritances and titles of land, although this province or the plantations in general are not therein named," 1715, 31, 7.
"All statutes for the amendment of the law, commonly called statutes of jeofails, and which were heretofore enforced in this territory by any act of the General Assembly under the late government." 1777, 2, 35, and 1794, 1, 27.
"All such statutes as were heretofore in force and use within this territory, or so much of the said statutes as are not destructive of, repugnant to, or inconsistent with the freedom and independence of this State, and the form of government therein established." 1778, 5, 1; Supra, 153; Shute v. Harder, 1 Y. 1; Tisdalev. Monroe, 3 Y. 320.
The following specific statutes have been held to be in force: —
34 Ed. III. 1, authorizing justices of the peace to bind persons "not of good fame" to security for good behavior. Estes v.
State, 2 Hum. 497, where, however, the point is waived with the suggestion that, if in force, it is perhaps superseded by 1801, 22.
4 H. IV. 18, providing that an attorney may be stricken from the roll for good cause. Smith v. State, 1 Y. 228.
8 H. VI. 9, and 31 Eliz. 11, in relation to forcible entry and detainer. Dillon v. State, 4 Hay. 271.
11 H. VII. 12, for benefit of poor persons. Bramley v.
Hayworth, 3 Y. 422; Dudley v. Belch, 4 Hay. 193.
27 H. VIII. 10, statute of uses. Wilson v. Kilcannon, 4 Hay. 182; Barry v. Shelby, 4 Hay. 229; Shute v.
Harder, 1 Y. 1. About the year 1852, our Supreme Court was understood to hold that the statute of uses was not in force in this State, but the language was modified in the opinion as printed; Smithv. Thompson, 2 Sn. 386. See editor's note to Russellv. Stinson, 3 Hay. 1.
31 H. VIII. 1, and 32, H. VIII. 32, upon the subject of partition. Sawyers v. Cator, 8 Hum. 256.
32 H. VIII. 28, on wife's right of entry after alienation by husband. Miller v. Miller, Meigs, 493.
32 H. VIII. 30, and 4 5 Anne 16, statutes of jeofails to cure errors after verdict. Payton v. Trigg, 4 Hay. 250; Harmonv. Crook, 2 Y. 133.
37 H. VIII. 8, jeofails; words vi et armis not essential in indictment, Tipton v. State, 2 Y. 542.
27 Eliz. 12, prescribing the form and mode of administering oaths of deputy sheriffs, Glasgow v. Smith, 1 Tenn. 154.
31 Eliz. 5, prescribing two years' limitation of actions for penalties. State v. Moore, Meigs, 476.
21 J, I. 16, 3, six years' limitation of debt on simple contract. Tisdale v. Monroe, 3 Y. 320.
29 Ch. II. 3, 10, trust estates in land subject to execution. Shutev. Harder, 1 Y. 1; Shields v. Mitchell, 10 Y. 1.
5 Geo. I. 13, jeofails, to cure errors after verdict in writs of error. Johnson v. Planter's Bank, 1 Hum. 77.
5 Geo. II. 7, 4, lien of judgment. Porter v. Cocke, Peck, 30.
9 10 W. III. 15, arbitration. Rogers v. Nall, 6 H. 29.
The Code does not undertake to specify what part of the English laws and statutes are in force; and is, in fact, altogether silent on the subject. — ED.
[1] ORIGINAL NOTE. — This point is now settled, but ifres intergra, it would seem that agreeably to our laws., judgments should not create any lien agreeably to the opinion of Judge Williams in the text.
[1] See 4 Hen. Mun. 66, 68.
[1] See 4 Hen. Mun. 66, 68.
[2] See Ld. Ray. 216; 1 Lev. 134; 2 Call, 125.
[1] Art. 2.
[2] See acts passed in the years 1796, 1798; 3 Vol. L.U.S. 361, Ird. Rev. 663.
[1] See 2 Dall. 384; T. Bl. accordant.
[1] See Vat. B. 2 c, 17, §§ 305, 308; Amendment to Con. U. S. arts. 11, 12; 1 T. Bl. app. to part 1, 307, 308; Ib. 412; Vat. B. 1, c. 1, § 10; 2 Dall. 384; 1 T. Bl. app. to part 1, 269; 4 Johns. 163.
[2] 3 Vol. L. U. S. 301; 4 Vol. L. U. S. 527.
[3] Federalist, No. 42; T. Bl. app. to vol. 1, part 1, 253.
[1] A similar question was decided by White, J., in the case of Campbell's Lessee v. Overton, and by Humphreys and Powell, in the case of Goodloe's Lessee v. Wilson, at Nashville, in relation to the continental line; viz., that having been run by public authority, it was obligatory as to the rights of individuals.