## AT NISI PRIUS, AT UNION TOWN,

### MAY ASSIZES, 1795.

CORAM, M'KEAN CHIEF JUSTICE, AND YEATES.

# Lessee of Thomas Smith, esq. *against* Bazil Brown.

Declaration in ejectment altered after the jury was sworn, to make it conformable to the record.
A prior improvement under Pennsylvania, shall prevail against a Virginia certificate, under the compact between the two states.
Between claimants under Virginia, the certificate of the commissioners is conclusive. Aliter, where one of the parties claims under a Pennsylvania.

[Smith's Lessee v. Brown.]

EJECTMENT for one messuage and 280 acres of land in Menallen township.

On motion of Mr. J. Woods for the plaintiff, the names of Francis Pursley and Benjamin Brashiers were struck out of the declaration in ejectment, after the jurors were sworn, and *514] the *name of Bazil Brown inserted in lieu thereof, to make the record conformable to the entry in the Supreme Court docket, the appearance of the attorney for the defendant, and the distringas and distringas by proviso issued for trial; though Mr. J. Ross for the defendant would not consent thereto.

It appeared on the evidence, that William Brashiers settled with his family on the lands in question, in 1769, and lived there several years. His brother, Joseph Brashiers, who was unmarried, continued with him two or three years, and assisted him to work the lands. A cabin was built and about ten acres cleared. Previous thereto, a cabin of four logs was begun in 1767, by Zachariah Brashiers, and it was then called his improvement, but neither he nor Joseph Brashiers ever claimed the lands. Two judgments were obtained in Bedford county against William Brashiers in April term 1773, and in consequence of writs of *fieri facias* issued thereon, the premises were levied on, condemned by inquisition taken at the dwelling house of Thomas Brown, the brother of the defendant, near the land, and afterwards sold to the lessor of the plaintiff, at public vendue, for 40l. 6s. The sheriff's deed to him was dated 15th April 1775. On the 4th August 1784, Mr. Smith took out a warrant for 280 acres, including William Brashiers' improvement, interest to commence from 1st March 1769, and on the 21st March 1785, obtained a survey, but the same was returned in dispute. William Brashiers also claimed a survey without authority, in 1770, but it did not appear precisely in what year he quitted the lands.

The defendant claimed under a certificate of three commissioners, appointed under a law of Virginia, passed 3d May 1779, to adjust the claims of the settlers, which declared him entitled, as assignee of William Brashiers, to 400 acres in Yohiogeney county, to include his settlement in 1770, which was regularly entered in the office of the county surveyor on 22d December 1779. But the transfer from William Brashiers to him was not produced, nor any account given of it. A survey was afterwards made for the defendant, on 21st March 1785, and returned in dispute. The survey was returned on another certificate by mistake, but of this no advantage was taken. The defendant and his tenants worked the lands since William Brashiers quitted the possession thereof.

It was contended on the part of the defendant, that there was no evidence of Zachariah Brashiers, the first improver, abandoning his claim; that the improvement of William

[Smith's Lessee v. Brown.]

Brashiers was a mere chattel interest, not bound by the judgment, and that he *probably left the land and sold his [*515 claim before the same was levied on. It was incumbent on the plaintiff to shew that he was in possession of the premises when the same were seized in execution. The compact between the two states should be preserved inviolate. The agreement of the commissioners was confirmed by Pennsylvania on 23d September 1780, and afterwards by law passed 1st April 1784 (2 Dall. St. Laws, 207.) It was ratified by Virginia on 23d June 1780, on the express condition that private property should be secured and confirmed to individuals. There was a positive and explicit stipulation, that the elder or prior right under either state should be preferred. When the agreement took place between the commissioners of both states, or at the ratification thereof, no law of Pennsylvania existed, which recognized the right of improvement; and this too is expressly declared by the act of 30th December 1786. (2 Dall. St. Laws, 487.) On the other hand, Virginia, by her law of 3d May 1779, enacts that a settlement shall gain a right, and defines a settlement to be "the making of a crop "of corn, or residence on the lands for one year before 1st "January 1778."

It has been determined at Washington, in Yeates's lessee v. Taylor, that a settlement set out in the certificate of the Virginia commissioners shall not controul a prior Pennsylvania right; but where there is no prior adverse right recognized by the then existing laws, the certificate of the Virginia commissioners must, in the nature of the thing, be conclusive evidence of the title. A known acknowledged right, such as a prior patent, or warrant or application, and survey returned thereon, can only defeat the interest of a Virginia claimant; and it is hoped, that this being the first direct attack of the mutual compact, which involves the national faith, it will be firmly resisted both by the court and jury.

The counsel for the plaintiff answered the foregoing arguments with much ability:

And M'Kean C. J. in the charge of the court to the jury, observed, that it could not be seriously pretended that the four-log improvement, never prosecuted for twenty-eight years, could be deemed the shadow of a right. To give an improvement any equity whatever, it must not have the smallest cast of an abandonment. The weight of evidence shews, that William Brashiers was in possession of the lands when the judgments were obtained and the levies made; and there can be no difficulty in pronouncing under our acts of assembly, that if he could *sell his interest therein to [*516 the defendant, the sheriff might at an anterior period take the same in execution. Should it be pretended that his sale overreaches the judgments and executions, the *onus pro-*

[Smith's Lessee *v.* Brown.]

*bandi* lies on the party affirming this fact.  If it was by writing, let the written instrument be produced; if it is lost, or was by mere parol, bring forth the witnesses.  The offering no proof of the sale, under the present circumstances, is strong evidence that the defendant does not wish to play a fair game.  He affirms the *jus proprietatis* in William Brashiers, by accepting his assignment; and if it was posterior to its being levied on, the premises would be subject to the lien. All persons are bound to take notice of the judgments of courts of record, and it is more than probable that the defendant actually knew of the lands being seized on, from the inquisition being held at the house of his brother Thomas, nigh thereunto, and its notoriety in the country.  Suppose he had a real honest claim to the lands, either under Brashiers or otherwise, and he was informed of the sheriff's advertisements, he should have given notice at the sale, to prevent the purchaser from being deceived by payment of his money. Failing herein, he shall be postponed, as in the case of a first mortgagee silently permitting another to lend his money on the security of the same lands; or one having a title to lands, and suffering another to expend his property in buildings thereon, without giving him notice of his right.   2 Vern. 151.  9 Mod. 37, 38.   1 Wms. 394.

There can be no doubt, but that on every principle of moral and political obligation, the compact between the two states should be held sacred.   And this brings it to the question, whether William Brashiers' improvement is the elder or prior right, under Pennsylvania.   So wild and extravagant have been the notions of many people about improvements, that it is not easy to define them.  In the language of the act of 30th December 1786, it is understood to be " an actual per-" sonal resident settlement, with a manifest intention of mak-" ing it a place of abode, and the means of supporting a " family, and continued from time to time, unless interrupted " by the enemy, or by going into the military service of this " country during the war."   The settlement in question clearly comes within this description.

There are three kinds of rights: *jus proprietatis, jus possessionis,* and *jus vagum,* or an imperfect right.   Settlements may be ranked among the latter species.   It is a right to pre-emption; a claim to a favour.

William Penn, esq. the first proprietor died in England, in 1718, and his son Thomas continued in his minority until 1731, Richard his other son, until 1732.   In this interval

\*517]   their land \*office was shut up, so that during that time warrants and patents were not regularly granted by the commissioners of property, for transferring lands to applicants. To further the settlement of the then province, within that period, tickets signed by one of the commissioners of property, or by the secretary of the land office, came into practice.

[Smith's Lessee v. Brown.]

Hence it would seem, sprung improvements. The old rule being once relaxed, greater liberties were taken by the people, and emigrants from abroad often seated themselves on vacant lands, (see act of assembly passed 27th November 1755, Miller's ed. vol. 2, p. 55,) without permission, and made valuable improvements. The usage of the proprietary land office was favourable to these settlements. The interests of the proprietaries were promoted, and the pre-emption of the lands they occupied was generally considered as belonging to the settlers. The inhabitants of the frontier counties in particular, availed themselves of the usage, and in many instances went much further then was ever intended by the lords of the soil, or their officers.

When the land office for the sale of the lands purchased at fort Stanwix was opened, on 3d April 1769, "those who had "settled the plantations were declared to have a preference;" and many judicial decisions were conformable thereto. The acts of 27th November 1755, 10th October 1779, and 16th March 1785, make improvements subjects of taxation. Several other laws since the revolution are favourable to real settlements, and particularly the limitation act of 26th March 1785, which pre-supposes, that under the received usage, a recovery might have been before legally had under a prior settlement, improvement, or occupation, where there had been an attendant possession within seven years before the suit brought. The former custom of granting the lands to real improvers, is clearly hereby recognized. And this custom is much older than the Virginia act of 3d May 1779, which gives for the first time, a preference to settlers, "who "had made a crop of corn, or resided on the lands for one "year before 1st January 1778." There can be no reason for making a distinction between the settlers under Virginia and Pennsylvania. Between claimants under Virginia, the certificate of the commissioners is conclusive evidence, but not where one of the parties claims under Pennsylvania. And so have been all the decisions. Under all the circumstances of the case before us, we think that the plaintiff is entitled to recover, under every principle of law and equity.

Verdict for the plaintiff.