2pw49|
187  251|

EDWARD BRIEN and wife *against* WEST ELLIOT'S heirs and others.

IN ERROR.

The Surveyor General of the Commonwealth had power to adopt a survey made after the 10th Dec. 1776, and before the passage of the act of 5th April, 1782; and such survey is valid by adoption, whether the return was made by a deputy Surveyor or by the proprietary's Surveyor General; and the circumstance that *John Lukens* was the last Surveyor General under the proprietary government, and the first under the Commonwealth, cannot affect the validity of his acts in the one character or the other: these are to be considered *redendo singula singulis*, as if they were done by distinct persons.

The discretionary powers of the Surveyor General, under the act of 5th April, 1782, are much greater than those that are merely incidental to the general nature of the office.

Previously to the act passed by the legislature of Virginia in 1779, a title to waste lands in that state, could not be acquired by improvement. Before that time, those lands might have been entered and patented, notwithstanding prior settlements by others.

The basis of the compact between the states of Pennsylvania and Virginia is an admission that the jurisdiction over the territory shall be taken to have been in common; and that the claimants under one state shall be entitled to the same protection against claimants under the other, that they would be entitled to between themselves.

If the actual origin of a title under either state be the earlier, it is not to be overreached by a law of the other, assigning to the opposing title a fictitious origin by the doctrine of relation.

The power of those two states to regulate questions of title to the soil, even at the expense of rights previously vested under either, cannot now be questioned. The consideration was the compromise of an inter-national dispute, and the individuals whose titles were jeoparded, had no right to call on the state from which they held, to assert their rights to the soil.

A Virginia certificate is not conclusive evidence of the facts stated in it; a Pennsylvania claimant may shew fraud, mistake, or trust.

THIS cause came up on an appeal by the defendants, from the Circuit Court of *Allegheny* county, at which *Justice Smith* presided.

It was an action of ejectment for the recovery of 150 acres of land in St. Clair township, brought by *Edward Brien* and wife against the heirs of *West Elliott*, dec'd., the heirs of *John Graham* dec'd. and the terre-tenants.

The plaintiffs gave in evidence, a warrant to *Edward Hand*, dated, 24th Nov. 1773, indorsed by *Alexander M'Clean*— "Rec'd. 1st Jan. 1774, executed 21st. Jan. 1778." Also a warrant of the 24th Nov. 1773, to *John Elder*, indorsed "Rec'd. 1st Jan. 1774, executed 21st Jan. 1778." They also offered "a survey dated Jan. 1778, made in pursuance of the warrant to *Edward Hand*, of 389 acres and allowance, situate on

7

(Edward Brien and wife *v.* West Elliott's heirs and others.)

the West side of the Monongahela river, near adjoining Charters' creek, heretofore in the county of Westmoreland, now in the county of Washington, *protracted and laid down from the field work of Alexander M'Clean, Esq. D. S. of Westmoreland county, by*"            John Lukens, S. G.

A receipt from *John Lukens* for £3 7 6, the office fees. Also a receipt of *Alexander M'Clean,* D. S. for £8, surveying fees.

The survey signed *John Lukens,* S. G. was objected to by the defendant on the ground that it had not been regularly made and returned into the office by a deputy surveyor, but was made in the office by the Surveyor General. This objection was overruled.

The plaintiffs then gave in evidence a patent to *Edward Hand,* dated 9th March, 1782, for 389 acres which recited the beforementioned warrant to *Edward Hand;* consideration £10 17 3. And also a patent to *Edward Hand,* dated 9th March 1782, for 371 acres, and which recited the warrant to *John Elder,* who by deed, on the 4th December, 1773, granted it to the said *Edward Hand.*

There was evidence given by the plaintiffs that *Gen. Hand* leased the land by parol, at an early period to *Thos. Watson,* he rendering a bushel of corn as rent.

A regular chain of title from *Edward Hand* to the plaintiffs in this suit was now given in evidence.

During the argument, the defendants gave up their claim under *West Elliott,* and relied exclusively upon the title of *Thomas Watson,* under whom they claimed; and of which they gave the following evidence:

That *Thomas Watson* made an actual settlement in the year 1772, and in 1780, 25th April, obtained a "Virginia entry" for 400 acres, including his improvement. 1st November, 1786, a survey was made of 273 acres 111 perches, which was returned 18th May, 1787, and for which a patent issued to *Thomas Watson,* on the 22d March, 1791.

Much parol evidence was given to establish the lines of the plaintiffs' survey upon the ground, and those of the defendants; and also about the possession, all which is so imperfectly contained in the paper book, that it would not serve to elucidate any point which arose in the cause. And it is only necessary to state that the plaintiffs, in the Circuit Court, also relied upon a "Virginia entry," by *Edward Hand;* of an older date than that of *Thos. Watson;* but in this Court they relied mainly upon their Pennsylvania title.

His Honor who held the Circuit Court, was requested to charge the jury on the following propositions of the defendants.

1st, Plaintiffs having shewn in evidence two warrants, one in

the name of *Edward Hand,* and another in the name of *Elder,* which do not call for settlements: they are thereby precluded from the benefit of any settlement anterior to the date of the warrants. The Virginia entries shewn do not vest any title in the plaintiffs, in law or equity; the same not having been pursued, but abandoned.

2d. The certificates of surveys exhibited by the plaintiffs, are not legal evidence that the surveys were made by the deputy Surveyor, on the plaintiffs' warrants.

There is no legal evidence that the plaintiffs' surveys were made by a deputy surveyor, or any person legally authorized to make them. They are not, as against the defendants, legalized by the plaintiffs' patents.

This proposition applies particularly to the defence under *Watson's* title, he having settled on his land in 1772.

3d. *Watson* had an equitable title to a tract of 300, if not 400 acres, including his improvements. The plaintiffs, by their warrants, had a right to survey two tracts of 300 acres each, with 10 per cent. surplus: they surveyed on one of their warrants 389 acres—on the other 371 acres. *Watson's* survey contains only 273 acres. He was living on his land at the date of the plaintiffs' survey, and *John Bell* proves that from the time of his entry, he claimed the land in dispute. Under these circumstances, the plaintiff had no legal right to encroach upon *Watson,* and include a part of his land. *Watson's* settlement, survey and patent are a valid title against the plaintiffs.

4. *Watson,* or his representatives, have been in possession, residing upon and improving the land in dispute since 1789. No person has resided on or improved the land in dispute under the plaintiffs. From these facts, the jury may lawfully presume an ouster of *Hand,* and those claiming under him. Their possession was adverse, and is protected, to the extent of their lines, by the statute of limitations.

5. The alleged agreement of *Watson* to become the tenant of *Gen. Hand,* if proved, was a surrender of his patent title, and his only estate, without consideration; or upon a consideration so grossly inadequate, as to evince gross ignorance of his right, or fraud. In either case it was utterly void. Considered with reference to all the testimony respecting it, and to the fact that *Brien* made no defence for *Watson's* heirs in the suit of *Elliott* against them, conducted by his agent as counsel of *Elliott,* the alleged agreement of *Watson* with *Gen. Hand,* does not deprive the defendants claiming under him, of the benefit of the statute of limitations.

6. If the jury believe the facts stated by the witnesses, they may lawfully presume an ouster of *Hand,* and those claiming

(Edward Brion and wife *v.* West Elliott's heirs and others.)

under him. The statute of limitations will protect *Elliott's* possessions, to the extent of the lines of his survey.

SMITH, J, to the jury. 1st. In answering this proposition, it is to be observed, that the three Virginia entries were not produced by the plaintiffs, until the defendants had shown their title, and therefore came before the Court, rather as repelling evidence, and in answer to what had been shown by the defendants. The plaintiffs, in the opinion of the Court, are entitled to every advantage which they could have claimed under their Virginia entries, in case they had had surveys made under them, and had taken out patents thereon: because by the compact between Virginia and Pennsylvania, *Edward Hand,* after the 23d of September, 1780, had a right to have demanded from Pennsylvania patents for the lands described in his entries, by virtue thereof, on paying to Pennsylvania, at the rate of £0 16s. 8d. Pennsylvania currency, for one hundred acres. But *Edward Hand* also took warrants from Pennsylvania for the same land; upon which he was entitled to patents, on paying at the rate of £8 6s. 8d. for an hundred acres. Both sums Pennsylvania could not, and did not, demand for the land. *Edward Hand,* under these circumstances, ought to have the benefit of both claims, and cannot be considered as having abandoned either. *Edward Hand's* entries, then, are prior in time to *Watson's,* and call for improvements thereon: and it is certified that they were made in 1770, before any improvement is proved to have been made by *Watson.* As, then, between *Hand* and *Watson,* both claiming under Virginia, the certificates would be conclusive evidence of the date of *Hand's* improvement; and he having the older improvement, ought to prevail. But if *Hand,* at the date of his warrant, had had no improvement, yet if, before the date of his entries, he bought or obtained *William Wood's* improvement, on which he made an entry and obtained a certificate, it would be conclusive.

2d. It appears the Surveyor General certifies the plaintiffs' surveys to have been made. At the time the surveys were returned by him to the Secretary of the Land Office for patenting, he might have made the surveys in person, or have adopted the work of any other person in whom he would have confided to make out and certify the surveys; and this more especially so in relation to the field work or notes of one who had been a regular deputy surveyor, at a time when the warrants were issued, directed and delivered to him to be executed. Besides, it appears from other evidence, that the surveys of the plaintiffs, as certified by the Surveyor General, were actually made on the ground: that they were adopted and sanctioned by the land-officers, and patents thereon issued. Under all these circumstances, they are good, and the evidence of them sufficient. In addition to this, the

(Edward Brien and wife *v.* West Elliott's heirs and others.)

warrants of *General Hand* are descriptive of the land, and attached to it, from their dates.

3d. Under the Virginia entries *General Hand* had a right to four hundred acres under each entry. His settlements, it would appear, were all made in 1770; and if so, prior in time to any settlement by *Watson.* *Hand's* certificates would then be *prima facie* evidence, that his improvements were made in 1770, against one claiming under a Pennsylvania right, but as against *Watson,* who claims under a Virginia improvement and entry, they are conclusive.

4th. If the jury believe that *Hand* had the first warrants and entries under Virginia, and also the first surveys, he must be considered as in possession of all the land within his lines, until an actual possession was taken by *Watson.* The jury must decide when *Watson* took possession; and if they believe, that *Watson* took no actual possession, until after he had sold to *Thomas Steel* in the fall, and that in 1794, he was on *Hand's* land, and that he then agreed to become, and did become, *Hand's* tenant; whatever his possession may have been before, it ceased, from this time to be adverse—no ouster in such case, if the jury believe the testimony, could be presumed.. The jury will take, on this point, the testimony of *General Gibson* into their consideration. If the jury, however, can say, from the evidence, that *Watson* and his representatives have had twenty-one years adverse possession of the land in dispute, prior to the commencement of this action, the defendants can hold it..

5th. If the jury believe, that the agreement of *Watson* with *Hand,* to hold under him, was fairly made, it would prevent *Watson's* possession being considered adverse, and if *Hand's* title be the better in other respects than *Watson's,* the plaintiffs would be entitled to recover. If the jury believe that the agreement between *Hand* and *Watson,* was in the nature of a settlement and compromise of their differences as to their boundaries, it would be a sufficient consideration to support the agreement between them; and it would be binding on both parties. Whether it was so or not, is for the jury to decide.

6th. If the jury believe, that *Elliott's* location did not call for the land in dispute, it could not attach until a survey was made on it, and returned into the Surveyor General's office. His survey was made in September, 1784: it does not appear that it was returned before April, 1785, when he took out his patent: but long before this, *Hand* and those claiming under him, if you believe the evidence, were in the possession of the land; first by warrant and survey, next in actual possession by his tenants. If this be believed by you, *Elliott's* survey gave him no possession of the land, as against *Hand;* as, then, between *Hand* and *Elliott,*

(Edward Brien and wife *v.* West Elliott's heirs and others.)

*Hand* having the older legal title, the possession of the land will be referred to his title, and considered in him, until an actual possession was taken by *Elliott*, which was not until some time between 1803 and 1807; during the agency of *Mr. Addison*, when he cleared a field of about ten acres, over *Hand's* line. The suit was brought in 1814. The statute of limitations, if the evidence be believed, therefore, cannot avail *Elliott*. If the jury believe the facts to be otherwise, and believe an ouster of *Hand* and those claiming under him, by *Elliott* and those under him, the statute of limitations, in such latter case, would protect *Elliott's* possession to the extent of the lines of his survey.

The jury having found a verdict for the plaintiffs, the defendants moved for a new trial, and assigned the following reasons therefor:

1. The Court erred in admitting in evidence to the jury, the certificates from the Land Office of the surveys under the warrants, in the names of *Elder* and *Hand*.

2. The Court erred in charging the jury, in answer to the first proposition put to them by defendants' counsel; especially, in relation to the effect of the Virginia certificates produced by the plaintiffs.

3. The Court erred in their answer to the second proposition of the plaintiffs' counsel relative to the effect of the certificates of the Surveyor General, *John Lukens*, as to the surveys under *General Hand's* warrants.

4. The Court erred in assuming, that *General Hand* had the prior settlement on the land in dispute, and predicating this assumption upon his Virginia certificates; also in omitting to charge upon his right to encroach upon *Watson*.

5. The Court omitted to charge the jury upon the essential point stated in the defendants' fourth proposition.

6. The Court erred in charging upon the defendants' fifth proposition; and omitted the essential point submitted, relative to the consideration of *Watson's* agreement with *Hand*.

The motion for a new trial was over-ruled, and judgment entered upon the verdict, from which the defendants appealed.

*W. W. Fetterman* for appellants.

By the act of 21st March, 1823, *Purd. Dig.* 258, copies of original papers in the office of the Surveyor General, are made evidence; but the certificate of the Surveyor General given in evidence in this case, was not a copy of any paper in that office; it was, at all events, but a copy of a copy, and should not therefore have been received, *Penn v. Hartman*, 2 *Dal.* 230. *Morris v. Vanderen*, 1 *Dal.* 65. *Chambers v. Mifflin*, 1 *Penn. Rep.* 79. It could not have been a copy of the return of the deputy sur-

veyor, for it does not appear that *Alexander McClean* ever made any return: his field notes, if they found their way into the office, was no return. A return is only good when made in pursuance of the act of Assembly. *Salmon v. Rance,* 3 *Serg. & Rawle,* 310. *Davis v. White,* 3 *Yeates,* 587. *Hubley v. Chew,* 2 *Yeates,* 133. *Hubly v. Vanhorn,* 7 *Serg. & Rawle,* 185.

*Watson* settled on the land in 1772, and had a right, by virtue of such settlement, to appropriate to himself three hundred acres. *Gilday v. Watson,* 2 *Serg. & Rawle,* 407. *Davis v. Reefer,* 4 *Bin.* 161. *General Hand's* warrant was not obtained till 1773, and did not recite any previous settlement; he could not, therefore, claim under any settlement made before the date of the warrant; it would have been a fraud upon the commonwealth. He cannot claim by virtue of his Virginia entry, because he cannot claim under both states. Virginia act of May, 1799, 10 Henning's Statutes, 40. Compact between Pennsylvania and Virginia, made by Virginia, 31st Aug. 1779: ratified by Pennsylvania, 23 Sept. 1780. *Sims v. Irvine,* 3 *Dal.* 426.

There was no consideration for the lease from *Hand* to *Watson* and the court, under the circumstances of the case, should have instructed the jury, that it was *prima facie* evidence of fraud. There was *no evidence at all* that it was a compromise, as the Court told the jury might be the case. It was such an agreement made with a weak old man as chancery would set aside, *Clarkson v. Hannay,* 2 *Pr. Wms.* 204.

*Ross* for appellees.

It is not now the source of complaint that the verdict and judgment against *Elliott's* heirs has done them injustice: I take it for granted, then, that that part of the defence has been abandoned.

from their date, 24th Nov. 1773. In January, 1774, they were put into the hands of the deputy surveyor, and his fees paid: in *Gen. Hand's* warrants are precisely descriptive, and give title 1774 Dunmore's war commenced:—in 1775 a deputy surveyor would have been punished under the laws of Virginia, if he had attempted to make a survey: and in 1776 the revolution commenced. Our surveys were made in 1778. By the act of 1779, *Purd. Dig.* 688, the titles derived from the proprietaries, to whom money was paid, are confirmed under the commonwealth. After this, no Virginian can come in and say that our land officers acted improperly in granting this land. Warrantees, before 1776, shall be entitled to patents, upon the payment of the purchase money: Act of 9th April, 1781, sec. 5: by the 7th section nine months are given to return surveys, and within those nine months a return is made and a patent issued to *Gen. Hand.* It is

not material when the survey made by the deputy surveyor came into the office: for by the act of 1782 a defect for want of a return within the nine months, shall not injure the warrantee. Our patent issued before this act was passed.

But it is said that no *draft* was returned by the deputy surveyor. There is no absolute necessity for a draft: all the deputy surveyor was bound to do was to satisfy his principal, that he had made a survey: this he did, and his principal was satisfied. How could the draft have been made to correspond exactly with the lines upon the ground, if the lines had not been run: five surveyors, who were examined as witnesses, say that the lines are there, and correspond with the draft made by the *Surveyor General.*

The defendants' title arises out of a Virginia certificate, granted to *Thomas Watson,* which authorized him to have surveyed a quantity of land, if the same had not been previously surveyed; and by this authority he run in 40 acres of *Gen. Hand's* land. *Watson* sold all the land he had "clear of *Hand's* line" to *Sample;* he also applied to the Surveyor General "to throw out the patented land." He never intended to take any of *Hand's* land. In Virginia, previously to 1779, an improvement gave no preemption right. *Jones* v. *Williams, Washington's Rep.* 230. If it did, our Virginia title is the elder, for our certificate calls for an improvement in 1770; their's for an improvement in 1773. *Gen. Hand* obtained his certificate *ex majore cautela.*

But it is said *Hand* cannot claim by virtue of an improvement alleged to have been made before the time mentioned in his warrant. What has a Virginia title to do with a Pennsylvanian? Try the cause in Virginia upon the certificates, and we have the better title; try it in Pennsylvania upon the validity of our Pennsylvania warrants, and we have the better title. If *Watson* ever designed to claim *Hand's* land, he should have obtained a special order, under an allegation of mistake, to have it re-surveyed. It is said we cannot claim under Virginia and Pennsylvania both; why not? If I purchase out forty different titles or claims, do I not purchase the estate of all; and may I not set them all up against the forty-first claimant?

As to the agreement between *Hand* and *Watson. Watson* seeks out *Hand* in Pittsburg, takes him to *Gen. Gibson's* house, and tells him that he came to see him about his land, that *Elliott* was going to bring a suit against him. *Hand* then gives him permission to live on the land for his life, he rendering a bushel of corn *per annum* rent. *Watson* recognized this agreement as long as he lived, and never denied it, or its validity. That is left for them who claim under him to do.

(Edward Brien and wife *v.* West Elliott's heirs and others.)

*Kennedy* on the same side.

During the provincial government, the Surveyor General was the only responsible surveyor known to the law; he might appoint general deputies *pro hac vice:* or a survey made before the date of the warrant, might have been and frequently was applied to it; or he might adopt the work of any individual as his own, if he thought it right, and certify that it was done in pursuance of a warrant. *Harris* v. *Monks,* 2 *Serg. & Rawle,* 557. *Stockman* v. *Blair,* 5 *Bin.* 211. *Shields* v. *Buchanan,* 2 *Yeates,* 219. *Funston* v. *M'Mahon,* 2 *Yeates,* 245. *Riddle* v. *Murphy,* 7 *Serg. & Rawle,* 330. *M'Kinsey* v. *Crow,* 2 *Bin.* 105. *Taylor* v. *Brown,* 5 *Cranch,* 234. *Craigh* v. *Bradford,* 3 *Wheat.* 597. *Stringer* v. *Young,* 3 *Peters' C. C.* 340

The issuing of a patent was a matter which came before nearly every member of the Board of Property. From 1776 till 1781, many surveys were made, and they were declared to be valid by subsequent acts of assembly. The only object in making a survey necessary was to *locate* the grant, and distinguish it from unappropriated lands. This was done in this case.

*Watson* had no title till as late as 1778, for an actual settlement under the laws of Virginia gave not even a pre-emption right. At that time he had no survey, and no marks of boundary. He was a citizen of Virginia, and claimed under that state alone. If *Hand,* in 1773, had obtained a Virginia entry for the land, he would have taken it from *Watson:* and shall not his Pennsylvania title obtained at the same time be better. A Pennsylvania improvement has preference to a subsequent Virginia entry. *Smith* v. *Brown,* 1 *Yeates,* 513. A Virginia certificate is not conclusive against a Pennsylvania claimant, but may be contradicted. *Hyde* v. *Torrence,* 2 *Yeates,* 440. *Jones* v. *Park, ibid.* 448.

In order to give title by the statute of limitations, the possession must be adverse. *Burns* v. *Swift,* 2 *Serg. & Rawle,* 436.

*W. Forward* in reply:

The certificate of the Surveyor General should not have been received in evidence, because it was not authentic: if evidence at all, it could only be so in pursuance of the act of 1823, which provides, that copies of papers in the Surveyor General's office shall be received in evidence: but this does not purport to be a copy of a paper in the office, because it is expressly said that the original is not in the office. Suppose *Lukens* were yet alive, yet Surveyor General, and here in court, could he give evidence of what is contained in this certificate? Could the field-notes of the deputy surveyor be given in evidence without proof of his hand-

(Edward Brien and wife *v.* West Elliott's heirs and others.)

writing? A survey is essential to a title, and it must be a legal survey. The act of 1777 abolished the office of Surveyor General:—the act of 1781 authorized the return of surveys, made upon other warrants, within a reasonable period, provided such surveys were made previous to 1777:—those made after 1777 were void. In this case it does not appear when the survey was returned: or whether it ever was returned by a deputy Surveyor. It was not even the case of an official survey and return. The warrants being descriptive, *if they are so*, is not material; because whether descriptive or not, they will not give title, unless a survey was made and returned. The fact of a patent having issued, does not give authenticity to the previous proceedings to obtain title.

*Thomas Watson* entered on the land under Pennsylvania; for in 1772 Virginia did not claim the jurisdiction to the country where this land lies; it was not till 1774. If *Hand* had brought his ejectment in 1774 against *Watson* he could not have recovered; for *Watson* had a settlement right, which had been commenced in 1772, such must also have been the case at any time previously to the compact between the states in 1779, and if so, does not that compact, in positive terms, secure to *Watson* his improvement right under Pennsylvania? If the plaintiffs can justly claim under both their titles, derived from Pennsylvania and Virginia, why shall not the same justice be meted out to the defendants? The plaintiffs' warrant was for 300 acres, upon which was surveyed 379 acres including 40 acres of our land, for the defendants are entitled by their improvement to 400 acres in a reasonable shape; can they claim the surplus beyond ten per cent., particularly as it interferes with our claim: the case of *Creek* v. *Moon*. 7 *Serg. & Rawle*. 330, is full to this point.

There was no acquiescence by *Watson*, for he complained when *Hand's* survey was made and frequently afterwards.

With respect to the lease. It does not appear that *Watson* came to *Hand*, and not *Hand* to *Watson:* when or by whom the proposition was made does not appear. What was the agreement? Not a sale, for there were no ceremonies of a sale: there was no change of possession: it could have passed no title, in the form known to the law:—there was no money or other consideration paid; and therefore no execution of the agreement. Was it a compromise of a doubtful title? One gave all; the other took all.

The opinion of the Court was delivered by

GIBSON, C. J.—The title of the plaintiffs under Virginia is worthless, and they do not in fact rely on it. Their title under Pennsylvania consists of two locations of the 3d April, 1769, sur-

(Edward Brien and wife *v.* West Elliott's heirs and others.)

veyed by the late proprietary Deputy Surveyor, in January, 1778; and returned by the proprietary Surveyor General, and by him *adopted* as Surveyor General under the commonwealth, on the 5th March, 1782.    On these surveys patents issued on the 9th of March, in the same year.    If this title be regular on its face, it will remain to inquire whether it be not earlier than that of *Watson,* the defence on the part of *West Elliott's* heirs being abandoned.

The objections are, that the surveys were made by a proprietary deputy after the 10th of December, 1776; that they were returned not by the proprietary deputy, but the proprietary Surveyor General; and that the Surveyor General of the commonwealth had not power, to adopt them under any of the acts of assembly which provide for surveys by the late proprietary officers after the closing of the Land Office.

Nothing is clearer than that they would have become valid by adoption, under the act of the 5th of April, 1782, had they been returned by the proprietary deputy instead of the proprietary Surveyor General.    They would then have been exactly within both the letter and spirit of its provisions.    In *Hubley* v. *Vanhorne,* 7 *Serg.* & *Rawle,* 190, it was conceded that the surveys would have become valid under this act had they received the sanction of the Surveyor General, but as that officer had either positively withheld it, *or never acted on the subject,* it was held that the act had not been complied with.    Here the surveys were expressly ratified; and the question is whether the return required by the act might not be made by the proprietary Surveyor General instead of his deputy; for that *John Lukens* was the last Surveyor General under the proprietary government, and the first under the commonwealth, cannot affect the validity of his acts in the one character or the other: these are to be considered, *reddendo singula singulis,* as if they were done by distinct persons.

Why might not these surveys have been executed by the surveyor General in person?    Even under the commonwealth, when the latitude of discretion allowed by the proprietaries who had absolute power over the subject, has been greatly abridged by positive law, if not entirely taken away, his act of adoption has been held to ratify a survey by one who was *not the proper officer,* and who consequently had acted without authority.    If then his power be competent to supply the want of authority in the first instance, surely it must be competent to supply the formal omission of tabling and plotting the field work which constitute, not the survey, but the evidence of it.    But the discretionary powers of this officer under the act of 1792 are much greater than those that are merely incidental to the general nature of the office.    He was to act without regard to form, and receive surveys on this

single condition—that they should "appear to him to have been *faithfully* and regularly made:" that is, as I understand it, made not surreptitiously, but on the ground. And he was to receive them not only from the late deputies, but in case of their death, from their legal representatives. It must therefore have been deemed of minor importance that he who had made the survey should return it. The great matter was to give assurance of a fair execution of a *bona fide* grant by the late proprietaries before the closing of the land office; and of this the new Surveyor General was made the arbiter, as to substance and as to form. There surely was no intention to exclude, for want of a formal return, during a period of official confusion in the course of a revolution, which ended in a change, not only of government, but also of ownership of the soil. A construction so rigid would frequently render the attempt of the legislature abortive; for there are few executors or administrators who are competent to complete the office work by draughting the surveys for return. For such a state of things was the act passed; and its provisions are well adapted to it. The field work and tabling being returned, from which the Surveyor General is perfectly able to judge of the fairness and regularity of the survey, it is not easy to see why he might not adopt it, and cause the draught to be made in the office. To this the Surveyor General evidently thought himself competent; and the cotemporaneous construction of an experienced officer, such as was *Mr. Lukens,* is entitled to decisive respect.

The heirs of *Watson* claim under Pennsylvania, and under Virginia. As an improver under Pennsylvania, *Watson* might have appropriated the land in dispute, by a survey within a reasonable time. His improvement was begun in 1760; but as a Pennsylvania settler he has had no survey at all. The plaintiffs' surveys were made in 1778; and the owner of the locations was certainly not bound to wait beyond that period to give *Watson* an opportunity to exercise his right of prior appropriation, unless enough were not left to make up his quantity in another quarter: a fact that does not appear. *Watson* was therefore postponed by his laches; and even should his survey on the Virginia certificate be a valid designation of boundary under Pennsylvania, yet even that was posterior to the plaintiffs' survey. *Watson's* heirs are therefore driven to a defence on their Virginia entry of 1780.

Previous to the act passed by the legislature of Virginia in 1779, a title to waste lands in that state, could not be acquired by improvement. "Before that time, those lands might have been entered and patented, notwithstanding prior settlements by others; and even this act, which considers settlers entitled to some compensation for the risk they had run, allows them a preference only to such settlements as AT THAT TIME were waste and UNAPPRO-

FRIATED. As to priority of settlement, it might still remain a question between persons, both of whom claim under the same sort of title; but the law of 1779 does not set up rights of this sort so AS TO DEFEAT THOSE LEGALLY ACQUIRED UNDER WARRANTS: IT AP-PLIES TO CONTROVERSIES BETWEEN MERE SETTLERS." Such are the words of the president of her Court of Appeals, in delivering its opinion in *Jones* v. *Williams,* 1 *Wash. Rep.* 231. It is said, however, that this is predicated of prior appropriations under grants by Virginia, and not those of Pennsylvania, which were disregarded before the period of the compact. Be it so. But whatever may have been the case originally, the titles under both were, as regards the question of priority, put by the compact exactly on a footing; and are by fair construction of it, to be treated as if they had always been so. Unless they were considered to have been, in relation to each other, valid, co-existent rights from the beginning, as far as regards jurisdiction, how could there be any comparison as to dates? The very basis of the compact is an admission that the jurisdiction shall be taken to have been in common; and that claimants under the one state shall be entitled to the same protection against claimants under the other, that they would be entitled to between themselves. If then the plaintiffs' title under Pennsylvania was perfected before *Watson* had even colour of title by the laws of Virginia, will an *ex post facto* law, which it is conceded would not give him title by relation against a prior grantee of Virginia, be more efficient against a grantee of Pennsylvania? It is an unfair construction to say, that a Virginia title shall be judged of as it happened to stand by the laws of that state at the time of the compact. If the actual origin of a title under either state be the earlier, it is not to be overreached by a law of the other assigning to the opposing title a fictitious origin by the doctrine of relation. Granting Virginia might lawfully declare that an unauthorized improvement should be taken to have vested title from its inception, *against herself,* yet having recognized the grants of another state as being equally valid as her own, it is fair to say she recognized them as being attended with all the incidents of her own, against which, it appears by the judgment of her own Court, the doctrine of priority by relation never prevailed. Neither is the power of the two states to regulate questions of title to the soil, even at the expense of rights previously vested under either, now to be questioned. The compact is necessarily founded in an assumption of it. There was no constitutional limitation on either side; and the parties acting in the capacity of sovereigns, were fettered by no rule but their sense of expediency and justice. The consideration was the compromise of an international dispute, and the individuals whose titles were joeparded, had no right to call on the state from which they held, to assert their rights to the soil.

(Edward Brien and wife *v.* West Elliott's heirs and others.)

In the act of ratification by Pennsylvania it was resolved, "That although the conditions annexed by the legislature of Virginia to the ratification of the boundary line agreed to by the commissioners of Pennsylvania and Virginia on the 31st of August, 1779, may *tend* to COUNTENANCE some unwarrantable claims which may be made under the state of Virginia in consequence of pretended purchases or settlements pending the controversy, yet this state (Pennsylvania) determining to give to the world the most unequivocal proof of its desire to promote peace and harmony with a sister state, so necessary in this great contest with the common enemy, does agree to the conditions proposed by the state of Virginia in its resolves of the thirty-first of June last." And this was at one time supposed to be a waiver of objection to any Virginia title that should be certified. It was doubtless an agreement to close with Virginia on her own terms, and to encounter the danger of fraud and imposition of surreptitious titles which those terms rendered more imminent; not to waive all scrutiny and submit to fraud and imposition where it might be detected. Such a construction would in all cases have made the certificate conclusive evidence of the facts stated in it; which it was held in *Smith* v. *Brown*, 1 *Yeates*, 516, and the lesse of *Hyde* v. *Torrence*, 2 *Yeates*, 445, not to be. In the latter it was declared that a Pennsylvania claimant may shew fraud, mistake, or trust; or that the Virginia claimant was not in the country before the first of January, 1778—the point of time limited for the commencement of his settlement. To me however, the certificate seems not only inconclusive, but entitled to no particular favour.

The defendants also rely on the statute of limitations; but the proof is clear and full that the possession was not adverse, but by permission. I see no reason therefore to disturb the verdict.

Huston, J. and Ross, J. dissented.

Rogers, J. took no part in the decision, being of affinity to the plaintiffs.

                                        Judgment affirmed.